No. 88-214

IN THE SUPREME COURT OF THE STATE OF MONTANA

1989

_____

IN THE MATTER OF
C.C., Youth in Need of Care.

_____

APPEAL FROM:   District Court of Eighth Judicial District,
               In and for the County of Cascade,
               The Honorable Joel G. Roth, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

               John Keith, Great Falls, Montana

        For Respondent:

               Hon. Marc Racicot, Attorney General, Helena, Montana
               Kathy Seeley, Asst. Atty. General, Helena
               Patrick L. Paul, County Attorney; Tammy Plubell,
               Deputy County Atty., Great Falls, Montana
               Antonia Marra, (for child), Great Falls, Montana
               E. June Lord, (for father), Great Falls, Montana

_____

                        Submitted on Briefs:   March 31, 1989

                            Decided:  May 2, 1989

Filed:

_____
                        Clerk

Mr. Chief Justice J. A. Turnage delivered the Opinion of the Court.

The Youth Court, Eighth Judicial District, determined C.C. to be a youth in need of care. C.C. was removed from her mother's (K.C.'s) home pursuant to a petition for temporary custody filed by the Department of Social and Rehabilitation Services (SRS) (now Department of Family Services). Later C.C. was taken out of foster care and, after a dispositional hearing, she was placed in the custody of her natural father, B.C. Additionally, K.C. was ordered to pay monthly child support to the youth's father.

The mother appeals. The respondents are the State of Montana on behalf of the Department of Family Services (Department), the youth, and the father.

The three issues on appeal are stated by the mother as follows:

(1) Did the Youth Court err by transferring custody of C.C. because it had no jurisdiction to do so;

(2) Did the Youth Court err in awarding child support payments to the father;

(3) Did the Department of Family Services act arbitrarily in making its recommendation to the court.

We affirm the custody award and reverse the child support award. The third issue is without merit.

C.C. is a nine-year-old caucasian female. She first came to the attention of SRS in the spring of 1985 when it was reported that C.C. was left at home alone after preschool every day until 5:00 p.m. when her mother returned home from work. C.C. was just six years old at the time. C.C. was then living in the sole custody of her mother and had been since her parents divorced when she was an infant. Her mother was employed as a phone receptionist at a local business and, in fact, was not providing any supervision of C.C. while the mother was at work.

After being contacted by SRS and advised that this was unacceptable supervision of a minor of C.C.'s young age, K.C. placed C.C. in an SRS-approved daycare at county expense. However, K.C. was defensive and not open to the suggestions of SRS. She was resentful of their interference and told them of her financial inability to provide daycare for C.C. K.C. denied that the previous arrangements she had made for C.C. were harmful to her and explained that she had obtained a large dog to keep C.C. company and that she had instructed her to go to the neighbor's if she were frightened. Further, C.C. and K.C. had a phone-calling system of daily check-in calls.

C.C. continued in daycare until the next fall, but then was removed by her mother. Her mother again had the child walk home alone from school and remain in the family home alone until the mother returned from work each evening.

C.C. came to the attention of SRS again in March of 1986 when it was reported that C.C. had multiple deep purple bruises on her buttocks from a severe spanking inflicted by her mother. At roughly the same time, C.C. showed a social worker a bump on her head and bleeding gums she had from her mother harshly brushing her teeth as discipline.

This information was outlined in the affidavit filed by SRS in support of its petition seeking temporary custody of C.C. and an investigation. Hearing on that petition was held April 4, 1986, and the Youth Court determined C.C. to be a youth in need of care. She was removed from the temporary receiving home in which she had been staying since the petition was filed and was then placed in a foster home. Foster care continued for about a year. The mother exercised visitation of C.C. throughout these proceedings.

To make a final disposition, the court ordered an investigation and psychological studies. Psychological evaluations

of all parties and home studies of each parent were conducted in the months that followed the original hearing.

The dispositional hearing, which was continued a number of times, began January 8, 1988, and concluded on January 22, 1988. Testimony at trial was undisputed that C.C. had emotional problems that manifested themselves in peculiar behavior. C.C. was extremely afraid to get dirty for fear of being disciplined. She would not play with other children or with toys in order to keep clean. She had trouble completing homework at school, for fear of making a mistake and being disciplined. At the same time, C.C. exhibited some surprising social skills. Although shy and fearful at some times, she became quite talkative at other times and always responded positively to outside nurturing. C.C. impressed everyone as a bright and alert child.

Dr. Kuka, a clinical psychologist, testified at trial as C.C.'s therapist. He relayed many instances of psychological abuse of C.C. by K.C. in addition to the limited physical abuse. C.C. had an older sister, Brenda, who died of cancer. K.C. compared C.C. to Brenda on many occasions in a harsh and detrimental fashion: telling her to behave or she would be in the grave with her dead sister; telling her that she was not as pretty or well-behaved as Brenda. K.C. also instructed C.C. never to get out of bed at night or the "monsters from under the bed would get her." This terrified her greatly, which led to severe nightmares, headaches, and crying fits.

Dr. Kuka testified that C.C. should not live with K.C. until K.C. could recognize the effect her actions had on C.C. K.C. could not admit that this conduct was harmful to or abusive of C.C. K.C. was defensive and consistently denied responsibility for her actions. At one point, she told Dr. Kuka that it was C.C.'s fault and that C.C. forced K.C. to behave that way. Dr. Kuka recommended

4

that K.C. continue her own psychotherapy program, to continue visitation of C.C. to foster trust and abate the fear in that relationship, and that permanent custody be transferred away from the mother.

Dr. Rushworth, a clinical psychologist, testified at trial as K.C.'s therapist. She testified to K.C.'s progress in the two years since the case began, but expressed reservations about K.C. having custody. Dr. Rushworth ultimately could not recommend that K.C. have custody at that time.

All experts at trial testified that a final disposition of this case would be to C.C.'s benefit. She had been in foster care for a year and had since been living with her father on a "temporary" basis, which had continued for several months. Stability for C.C. and knowing definitely where she would be living permanently were stressed at trial as being in C.C.'s best interest.

B.C., C.C.'s natural father, lived in a different city when these proceedings began and had little contact with C.C. from the time of her birth until the time he became aware of her circumstances. However, B.C. had always provided for the financial support of C.C. and moved to the same city as K.C. during the proceedings.

B.C. testified at trial that he had never been the custodial parent of C.C. and that he hesitated earlier to do so because of his lack of parenting skills. Over the course of the proceedings, however, B.C. sought advice on parenting and began exercising visitation and custody of C.C. He testified that he now wanted custody of C.C., was comfortable in parenting her, and would allow visitation with the mother.

Home study of B.C. as conducted by the Department showed that B.C. had adequate parenting skills; no abusive tendencies; no history of abusive behavior; no alcohol or chemical dependency or

5

tendency for same. The Department concluded that B.C. could receive and care for the youth and recommended to the court in its report and by oral testimony in court that B.C. be awarded custody of C.C.

The Youth Court awarded custody to B.C., awarded him child support and allowed visitation by K.C. K.C.'s parental rights were not terminated. K.C. appeals that judgment and order.

I. Jurisdiction

Appellant's first challenge to the Youth Court order is that the court erred in transferring permanent custody because it had no jurisdiction to do so. Sole jurisdiction, the mother argues, for that type of action lies exclusively with the district court which originally dissolved the marriage and awarded sole custody to her. (The parties were divorced in Fort Benton less than one year after they married.) She claims that a transfer of custody can only be made by that court, on affidavit, after a change of circumstance, pursuant to the family law statutes set out in 40-4-219 et seq., MCA. We do not agree.

The Youth Court is created and governed by statute in Montana. However, because this case does not involve a youth charged with a violation of law, it is not within the Youth Court Act, section 41-5-101 et seq., MCA. Actions brought under that Act are within the exclusive jurisdiction of the Youth Court.

Rather, in this case, the Youth Court and the District Court have concurrent jurisdiction.

Section 41-3-103, MCA, reads in pertinent part:

> (1) In all matters arising under this chapter, the Youth Court shall have concurrent jurisdiction with the district court over:
>
> (a) all youths who are within the state of Montana for any purpose;
>
> . . .

6

> (c) any person who is alleged to have abused, neglected, or caused the dependency of a youth who is in the state of Montana for any purpose.

Thus, the Youth Court had jurisdiction over C.C. and K.C. and any challenge to that jurisdiction is unfounded.

Once a child such as C.C. has been determined to be a youth in need of care, the Youth Court has many options. The award of custody to B.C. is statutorily provided for in section 41-3-406, MCA. That section provides:

> If a youth is found to be abused, neglected, or dependent under 41-3-404, the court after the dispositional hearing may enter its judgment making any of the following dispositions to protect the welfare of the youth:
>
> (1) permit the youth to remain with his parents or guardian subject to those conditions and limitations the court may prescribe;
>
> . . .
>
> (3) transfer legal custody to . . . a relative or other individual who, after study by a social service agency designated by the court, is found by the court to be qualified to receive and care for the youth[.]

The Youth Court properly took in testimony that B.C. was qualified to receive and care for C.C. The findings made by the court are based on the substantial credible evidence of the experts and of B.C. The transfer of custody was lawful under this statute and no challenge to that transfer can be sustained. The court is affirmed on that issue.

Appellant contends that affirming the Youth Court on that issue would encourage parties who were not successful in obtaining custody pursuant to the family law statutes to try again to get

custody through a Youth Court proceeding. That argument has no merit. We note only that this was not a custody battle between two parents. Rather, this action was instituted by the State of Montana when a petition for temporary custody was brought by SRS to protect C.C. The natural father later was apprised of the continued abuse and neglect of his child by his ex-wife. After being investigated and interviewed over many months, the court determined the father to be a qualified person to receive and care for the youth as provided by the statutes and ordered that legal custody be transferred to the father for the welfare of the child. That transfer of custody was lawful, was made to protect the welfare of the child and will not be overturned.

II. Child Support

The court erroneously awarded child support to B.C. That portion of the Youth Court order is reversed.

Child support in Montana is awarded only after the trial court considers "all relevant factors" pursuant to section 40-4-204(1), MCA. Such factors include, but are not limited to,

(a)   the financial resources of the child;

(b)   the financial resources of the custodial parent;

(c)   the standard of living the child would have enjoyed had the marriage not been dissolved;

(d)   the physical and emotional condition of the child and his education needs;

(e)   the financial resources and needs of the noncustodial parents . . .

Additionally, in order to award an equitable amount, the court must consider the formula set forth in In Re Marriage of Carlson (Mont. 1984), 214 Mont. 209, 693 P.2d 496. There is no record that the trial judge considered either the factors in section 40-4-204(1)

8

or the <u>Carlson</u> formula, except to note that the father had just started a new business and that the mother was employed as a receptionist.

Where there is insufficient evidence to support a finding that child support is necessary, there has been an abuse of discretion. See for discussion, In re the Marriage of Keel (Mont. 1986), 726 P.2d 812, 43 St.Rep. 1742. There is insufficient evidence in this case. The child support award is reversed.

It should be noted here that B.C. did not request an award of child support. If, in fact, he is financially in need of child support from his ex-wife, he could petition the proper forum at a later date and put forth evidence of the factors listed herein.

Lastly, K.C. contends that the Department acted arbitrarily in its recommendation to the court regarding custody of C.C. K.C. bases that allegation on her suspicion that the Department had been following her and just wanted a reason to take her child away. She states that the Department acted arbitrarily in recommending she not have custody because they did not recognize the progress she had made with Dr. Rushworth during the months of therapy. Rather, they had already made their minds up months ago that K.C. should lose custody of her child, K.C. argues. That argument is without merit.

The only proper question for review that K.C. could pose to this Court on appeal is whether the Youth Court acted arbitrarily in following the recommendation of the Department. We have already held that the custody award was both lawful and supported by the substantial credible evidence in this record. We will not discuss further challenges to the custody award.

The custody award to B.C. is affirmed; the order regarding child support is reversed.

J. A. Turnage
Chief Justice

We concur:

_John C. Shelby_

_R. C. McDonough_

_William E. Hunt_

_Justices_